# UNITED STATES BANKRUPTCY COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

In re:

RMAA REAL ESTATE HOLDINGS, LLC,    Case No. 10-15244-RGM
                                    (Chapter 11)
   Debtor.

## MEMORANDUM OPINION

THIS INVOLUNTARY CASE is before the court on the motion of Access National Bank for sanctions against the three petitioners and their counsel under Fed.R.Bankr.P. 9011 and 11 U.S.C. §303(i)(2).  For the reasons stated in this Memorandum Opinion, the motion will be granted as to Rule 9011 and denied as to §303(i)(2).

## Federal Rule of Bankruptcy Procedure 9011

Every attorney who signs a petition in bankruptcy makes four certifications.  Two certifications are involved in this case: that the involuntary petition was not presented for an improper purpose; and that the claim that a limited liability company is treated as a partnership for purposes of §303(b)(3) of the Bankruptcy Code was warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law.  Fed.R.Bankr.P. 9011(b)(1) and (2).[1]

---

[1]     Rule 9011 states in part:

(b)     REPRESENTATIONS TO THE COURT.  By presenting to the court (whether by signing, filing, submitting, or later advocating) a petition, pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, –

(continued...)

## Rule 9011(b)(2) Certification

This case was commenced by Roger Amendola, Brett Amendola and Janet Amendola filing an involuntary petition in bankruptcy against RMAA Real Estate Holdings, LLC.[2] The petitioners were represented by John P. Forest, II, of StahlZelloe, P.C. In preparing the petition, Mr. Forest identified the type of debtor as a partnership notwithstanding that the alleged debtor was a limited liability company.[3] The petitioners filed the involuntary petition as members of the limited liability company, not as creditors. Acme Real Estate, LLC,[4] one of two managers of the limited liability company, opposed the involuntary petition. The court dismissed the petition ruling that a limited

---

[1](...continued)
    (1)    it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;
    (2)    the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;
    (3)    the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; and
    (4)    the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on a lack of information or belief.

(c) SANCTIONS. . . .

    (2)    Nature of Sanction; Limitations. A sanction imposed for violation of this rule shall be limited to what is sufficient to deter repetition of such conduct or comparable conduct by others similarly situated. Subject to the limitations in subparagraphs (A) and (B), the sanction may consist of, or include, directives of a nonmonetary nature, an order to pay a penalty into court, or, if imposed on motion and warranted for effective deterrence, an order directing payment to the movant of some or all of the reasonable attorneys' fees and other expenses incurred as a direct result of the violation.

[2] The petitioners were three of four members of the limited liability company. None was a manager. Roger Amendola is the father of Brett Amendola. Brett and Janet Amendola are husband and wife.

[3] There were four boxes from which counsel could select: "Individual (Includes Joint Debtor)"; "Corporation (Includes LLC and LLP)"; "Partnership"; and "Other (If debtor is not one of the above entities, check this box and state type of entity below)."

[4] Acme Real Estate, LLC, is a wholly owned subsidiary of Access National Bank which holds a first trust on the sole asset of RMAA, a luxury home under construction.

liability company is a corporation for purposes of §303(b)(3) of the Bankruptcy Code.[5] RMAA's Operating Agreement permitted it to file a petition in bankruptcy only with the consent of Acme, which was not given. An involuntary petition may not be filed against a corporation by its shareholders, or in the case of a limited liability company, by its members.

Mr. Forest made a decision to file the involuntary petition identifying the limited liability company as a partnership rather than a corporation. Checking the partnership box as opposed to the corporation box was intentional. In response to the court's questions during his opening statement, Mr. Forest stated:

> THE COURT: It was the wrong box but it was intentional because you wanted the benefit?
> MR. FOREST: Well, yes, it was – yes. Yes.
> THE COURT: . . . it wasn't just an accident? It wasn't a secretarial error?
> MR. FOREST: No. I –
> THE COURT: It was a thoughtful process that –
> MR. FOREST: No. I have to admit that I selected that box. I didn't miss with the mouse but that the purpose of filing that involuntary and the purpose of filing the second one, the 16505 case, was to attempt a reorganization of the debtor.

Transcript of Hearing on Sept. 13, 2010 at 36.

Mr. Forest had previously filed two involuntary petitions against other limited liability companies. In both, he identified the debtor as a corporation. He also filed two voluntary petitions for limited liability companies. In both, he identified the debtors as corporations. Mr. Forest proffered about his legal research justifying the filing of the petition and identifying the limited liability company as a partnership. He stated:

---

[5]This case was originally assigned to the Honorable Stephen S. Mitchell who heard the opposition to the involuntary petition and dismissed the case. The sanctions motion was reassigned to the undersigned judge in light of the filing of a subsequent involuntary petition in which Brett Amendola, Roger Amendola and Brevon Developers, Inc., were the petitioning creditors. *In re RMAA Real Estate Holdings, LLC,* Case No. 10-16505-RGM. In the subsequent case, RMAA was properly identified as a corporation. The three petitioning parties were identified as creditors.

> Your Honor, the proffer would be that prior to filing the involuntary petition in this case that I had researched whether fewer than all of the members of a limited liability company could file an involuntary petition as members of the limited liability company, that I did not find any authority precluding it; and based upon my recollection of some comments that were made in this court, I believed that it would be appropriate – excuse me. I shouldn't – that it would be appropriate to treat a limited liability company as a partnership for purposes of an involuntary petition.

Tr. at 75.

The significance of the choice of whether a limited liability company is treated as a corporation or a partnership is who can file an involuntary petition. Fewer than all of the partners of a partnership may file an involuntary petition against the partnership. That is not true of a corporation.

A limited liability company is to be treated as a corporation under the Bankruptcy Code. The form petition is plain on its face. Mr. Forest found no case law or other authority indicating to the contrary. The best he could do, was that he thought he had heard something in court more than a year earlier.[6]

---

[6] Mr. Forest expanded upon the brief proffer in his opening statement. He stated:

> It was my belief at that time that for purposes of the involuntary filing that a limited liability company could be treated as a partnership for purposes of taking advantage of the rule that fewer than all of the members could vote for it.
>
> Now, as Judge Mitchell had inquired of me when he held the hearing on the answer to the opposition petition, I was not able to identify any authority for that proposition; and I want to be very careful the way I express this but the closest that I could come to authority on that were comments that I had thought that Your Honor had made in court sometime during the fall of 2008 as to whether and for purposes of an involuntary an LLC could be treated as a partnership now.
>
> I do appreciate now because I – when I say I've done my research and counsel has done his research, I couldn't find anything saying that it was permitted. I would proffer to the Court that I couldn't find anything directly – when I say directly, I want to be careful - saying that it was precluded.
>
> But I do also need to acknowledge that the – when I say the current state law seems to be that for purposes of an involuntary an LLC is treated as a corporation and I obviously have found those cases and that's where I found them. Counsel cited them. I don't unfortunately have any authority to

(continued...)

In this case, it is clear that counsel did not satisfy the representation contained in Rule 9011(b)(2), specifically, that a limited liability company can be treated as a partnership and thus three members of the limited liability company can commence an involuntary case. His proffers show that he was aware that the form petition stated that a limited liability company was to be classified as a corporation, that he undertook virtually no legal research with respect to this matter, and that the research that he did undertake did not support his position. The best he could do was say that he thought he had heard something in court more than a year earlier to the contrary. He did not know when the statement was made or the context in which it was made.

In these circumstances, counsel violated Rule 9011(b)(2), that his assertion that a limited liability company could be classified as a partnership was warranted by existing law or by a nonfrivolous extension, modification or reversal of existing law or the establishment of new law.

---

[6](...continued)
the contrary on that.

>    I have searched my – and again, I m not trying to suggest that whatever comments I may recall of the Court's – I'm not going to suggest that those are binding on Your Honor.

>    I've gone through and tried to find my docket sheets from when I was here in the fall of 2008 and tried to figure out what possible case those would have been in. I'll be honest. I m not in a position where I can order a transcript of every day that I was here to try to figure out what was said.

>    But I just offer that as – I say as an explanation for why that particular box was checked. I have to be candid and say it wasn't an accident that I checked that box but I did believe at that time that that was the state of the law. I had done research before I filed it; again, couldn't find any authority one way or the other. Yet it was precluded; and I don't want to say that I apologize for relying on the Court because I have come to understand that perhaps when Your Honor asked that question, perhaps it was more of a hypothetical and you were just trying to frame an issue or spark an inquiry on something.

>    But that is the basis for which that particular box was checked.

Tr. at 32-33.

5

### **Rule 9011(b)(1) Certification**

Mr. Forest certified under Rule 9011(b)(1) that the petition was not filed for an improper purpose. This petition was the fourth filed within fourteen months and frustrated the bank's fifth scheduled foreclosure sale.[7]

The saga began before December, 2006, when the property was conveyed to Brett Amendola and Janet Amendola, as husband and wife, and Roger Amendola and Maureen Amendola, as husband and wife. Each couple held their interest as tenants by the entirety and the two couples held their tenancy-by-the-entirety interests as tenants in common. They were developers and intended to build a luxury home on the property and sell it.

Brett and Janet Amendola borrowed $2,250,000 from the bank on December 14, 2006. The loan was guaranteed by Roger and Maureen Amendola and Brevon Developers. All four of the Amendolas granted a deed of trust on the property which secured the loan. A year later, they granted a credit line deed of trust to another lender which secured a loan of $1,000,000. On December 3, 2008, the bank sent a default letter.

The first foreclosure sale was scheduled for May 8, 2009.[8] On May 4, 2009, Janet Amendola filed a voluntary chapter 7 petition[9] which stayed the scheduled foreclosure sale. She was represented by Januario J. Azarcon. She scheduled the property with a value of $3.5 million and liens of $3.4 million. She scheduled the first trust of $2,250,000 as being held by the bank and the

---

[7] Two additional bankruptcies were filed after the one under consideration and there have now been a total of six related bankruptcies and seven scheduled foreclosure sales.

[8] The parties agree on the chronology of the scheduled foreclosures and bankruptcies. The dates were set out in the Motion for Sanctions and discussed without objection during the hearing.

[9] Case No. 09-13498-SSM

6

second trust of $1.0 million as being held by Todd Tarring. No co-debtors were scheduled and her stated intention was to surrender her interest in the property. On May 21, 2009, the bank filed a motion for relief from the automatic stay. Relief was granted on June 17, 2009.

The second foreclosure sale was scheduled for July 17, 2009. On July 17, 2009, Brevon Developers, Inc., filed a voluntary chapter 7 petition.[10] Mr. Azarcon was counsel for Brevon. Immediately after filing the petition, he sent a fax to the trustees under the deed of trust demanding that they stop the foreclosure sale in light of Brevon's bankruptcy filing. Although Brevon had guaranteed the note secured by the property, it was not an owner of the property. The assertion that the foreclosure was stayed by §362 was wrong. *In re Geris,* 973 F.2d 318 (4th Cir. 1992). The trustees canceled the foreclosure sale as demanded then promptly rescheduled it.

The third foreclosure sale was scheduled for July 31, 2009. On July 31, 2009, Roger Amendola filed a voluntary chapter 7 petition[11] which stayed the scheduled foreclosure sale. He was represented by Mr. Azarcon.

On August 11, 2009, Brevon Developers was granted an extension of time to August 20, 2009, to file its schedules and statement of affairs. On August 20, 2009, Roger Amendola was also granted an extension of time to September 3, 2009 to file his schedules and statement of affairs. Brevon Developers did not file its schedules and statement of affairs and on August 21, 2009, its case was dismissed. Roger Amendola's case was dismissed on September 8, 2008, for failure to file schedules and statement of financial affairs. Janet Amendola was granted a discharge under chapter 7.

---

[10] Case No. 09-15677-RGM

[11] Case No. 09-16151-SSM

7

About this time, or earlier, the record is not clear, the bank sued Brett Amendola on the note and Maureen Amendola on her guarantee in state court[12]

In October, 2009, the bank and the four Amendolas and Brevon Developers entered into a forbearance agreement by which the bank agreed to forbear for a year. The forbearance agreement required, in addition to monthly payments, that the property be conveyed to a new limited liability company. The Amendolas and Brevon agreed that:

> Each borrower and guarantor represents and warrants that they will not individually or collectively, commence, join in, prosecute, encourage or participate in any suit or other proceeding in a position that is adverse to the bank in connection with the making, closing, administration, collection or enforcement by the bank of the loan documents or this agreement, nor will they individually or collectively, commence, join in, prosecute, encourage or participate in any involuntary bankruptcy filings against [RMAA].

Forbearance Agreement, §7. Sanctions Hearing, Sept. 13, 2010, Ex. 2.

The new limited liability company, RMAA, was formed and on December 28, 2009, the property was conveyed to it. Construction on the house continued, but the Amendolas and Brevon became in default of the Forbearance Agreement.

The fourth foreclosure sale was scheduled for May 24, 2010. The foreclosure sale was held and the property sold to the highest bidder, an entity in which Roger Amendola was a participant. The purchaser did not close on the sale. Tr. at 71-72.

The fifth foreclosure sale was scheduled for June 23, 2010. On June 22, 2010, Roger Amendola, Brett Amendola, and Janet Amendola filed the involuntary petition in this case as members of the limited liability company which stayed the scheduled foreclosure sale. John Paul

---

[12] It appears that the suit was filed after August 20, 2009, because Roger Amendola does not appear to have been a defendant which is consistent with him having filed a petition in bankruptcy and it is not listed in the statement of financial affairs of Janet Amendola.

Forest, II, of StahlZelloe, P.C., was counsel for the petitioning parties. This petition commenced this case and gives rise to the Rule 9011 sanctions motion which was filed shortly after the involuntary petition filed. The involuntary petition was dismissed on July 19, 2010. The dismissal order stated that:

> The court concludes that for the purpose of § 303(b)(3), Bankruptcy Code, which permits the filing of an involuntary petition by fewer than all of the partners of a partnership, a limited liability company is a corporation, not a partnership. As a result, the members (whether all or less than all) are not eligible to file an involuntary petition against the company.

Order Dismissing Involuntary Petition at 1. (Docket Entry 19). The court retained jurisdiction over the sanctions motion.

The sixth foreclosure sale was scheduled for August 3, 2010. On August 3, 2010, Brevon Developers, Brett Amendola, and Roger Amendola filed an involuntary petition against RMAA[13] which stayed the scheduled foreclosure sale. Mr. Forest was counsel for the petitioners who in this case asserted that they were creditors. On August 17, 2010, an order granting relief from the automatic stay was entered. It contained *in rem* relief against the real property.

The seventh foreclosure sale was scheduled for September 13, 2010. On September 13, 2010, Socrates Torres filed an involuntary petition against RMAA.[14] He was the sole petitioning creditor. Brett Amendola personally filed the petition in the clerk's office. Tr. 16. The involuntary summons was never served and the case was dismissed for failure to prosecute.

The Amendolas did everything that they could do to prevent the bank from foreclosing on the property. They delayed foreclosures prior to the Forbearance Agreement by three separate

---

[13] Case No. 10-16505-RGM

[14] Case No. 10-17701-RGM

9

petitions in bankruptcy, two of which were dismissed for failure to file schedules and statement of affairs and one in which they wrongly asserted that the voluntary petition filed by Brevon invoked the automatic stay. The parties sought to resolve their differences through the Forbearance Agreement in which all of the Amendolas agreed not to participate in any bankruptcy filing and that both managers, Acme, a wholly owned subsidiary of the bank, and Brevon which was owned by the Amedolas, needed to consent in order to file a voluntary petition. This provided the bank with a veto over the filing of any petition in bankruptcy. After the Forbearance Agreement became in default, the Amendolas and Brevon participated in three involuntary petitions. The Amendolas violated the terms of the Forbearance Agreement in filing the involuntary petitions after the Forbearance Agreement.

These actions show that the petitions were filed for an improper purpose, that is, to improperly gain the benefit of the automatic stay, a violation of Rule 9011(b)(1).

### Sanction for Violating Rule 9011

A sanction under Rule 9011 should deter repetition of improper conduct or comparable conduct by others similarly situated. Rule 9011(c)(2).

The genesis of Mr. Forest's violation of Rule 9011 is his identification with his clients and his consequent failure to exercise his independent legal judgment. Attorney's ought to zealously represent their client's interest, but that zealous representation must be within the bounds of the law, and in particular, Rule 9011. Here, Mr. Forest identified too closely with his clients and lost his professional detachment. His actions in identifying the limited liability company and filing yet another petition in bankruptcy in a series of petitions can be better described as grasping for straws

than sound legal research. Although the certifications are to be made "after an inquiry reasonable under the circumstances," there was no inquiry, only an effort to effect the client's objectives. This is far different from Mr. Forest's usual representation which is professional and well-considered. The absence of adequate research and reflection are indicative, in this case, of too great an eagerness to please the clients and the consequent loss of professional detachment.

The best remedy in this instance is to disqualify Mr. Forest and his firm from any further representation of any of the Amendolas, Brevon and RMAA for a period of two years from the date of the entry of this order and to enjoin the Amendolas and Brevon to comply with the terms of the Forbearance Agreement prohibiting them from participating in any bankruptcy of RMAA.

The court believes that this is sufficient to deter further improper conduct by counsel or the clients. Once professional detachment is lost, it is very difficult to regain it with the particular clients involved. The two-year period for the disqualification is sufficient to break the too-close connection between counsel and clients and prevents Mr. Forest and his firm from representing the debtors in any post-foreclosure actions that they may think that they have against the bank.[15] The disqualification does not preclude the Amendolas from retaining new counsel and properly pursuing any remedies against the bank, if in fact they have any. However, new counsel is expected to exercise his or her independent judgment.

Because the Amendolas have shown that they will willingly breach the Forbearance Agreement, the court believes that entering an injunction which carries the ability of the court to punish them, civilly or criminally, for further violations is a sufficient warning to them that they may

---

[15] The Forbearance Agreement contains a general release. Forbearance Agreement, §7. Sanctions Hearing, Sept. 13, 2010, Ex. 2.

not willfully disregard the terms of the Forbearance Agreement. If they should continue on that course of conduct, the court can punish them through its contempt powers. The threat of a monetary sanction against them at this point does not appear to be of any significance because of the obvious willingness on the part of some to file petitions in bankruptcy to discharge their debts.[16]

As for the bank, the loan documents and the Forbearance Agreement contain adequate provisions for recovering attorney's fees, costs and additional interest due to the delays.

### 11 U.S.C. §303(i)(2)

The bank's motion for sanctions under 11 U.S.C. § 303(i)(2) will be denied because the bank does not have standing to bring the motion.[17] Standing under §303(i)(2) is limited to the debtor.

The bank notes that §303(i)(1) expressly limits an award of costs or attorney's fees to the debtor, but that §303(i)(2) does not. It argues that the difference – the omission of the limiting phrase "in favor of the debtor" from subsection (2) – means that there is no limitation on who may recover under subsection (2) and permits it, and all others who may be injured by the bad faith filing, to recover their damages and punitive damages.

---

[16] The court expresses no opinion on whether a monetary sanctions order would be dischargeable in these circumstances.

[17] Section 303(i) states:

(i) If the court dismisses a petition under this section other than on consent of all petitioners and the debtor, and if the debtor does not waive the right to judgment under this subsection, the court may grant judgment –
    (1) against the petitioners and in favor of the debtor for –
        (A) costs; or
        (B) a reasonable attorney's fee;
    (2) against any petitioner that filed the petition in bad faith, for –
        (A) any damages proximately caused by such filing; or
        (B) punitive damages.

However, the introductory clause of §303(i) also mentions the debtor. It provides that the sanctions contained in subsections (1) and (2) may not be awarded if the debtor and all of the petitioners consent to dismissal of the involuntary petition or if the debtor waives "the right to judgment."[18] Clearly, the debtor controls the availability of damages under subsection (2). It can always waive the benefits of it. If damages under subsection (2) were available to third parties, it would be odd that the debtor could unilaterally waive them for the third parties. Generally, only an injured party can waive damages caused to it, not someone else who did not suffer those damages.

Three other courts have addressed the question of standing to assert damages by a non-debtor under §303(i)(2). None allowed non-debtors to recover damages. *Miles v. Okun (In re Miles)*, 430 F.3d 1083, 1093-94 (9th Cir. 2005); *Franklin v. Four Media Co. (In re Mike Hammer Productions, Inc.)*, 294 B.R. 752, 754-55 (9th Cir. B.A.P. 2003); *In re VII Holdings Co.*, 362 B.R. 663, 668 (D. Del. 2007).

In *Miles*, the court denied recovery under §303(i) to the debtor's wife and children who were trying to recover for damages related to ten involuntary petitions that had been filed against the debtor. 430 F.3d at 1094. The court noted that § 303(i)(1) and (2), read together, did create an ambiguity, noting that although 303(i)(1) is clear that only a debtor may recover under that subsection, subsection 303(i)(2) is ambiguous because it does not include the language "in favor of the debtor." *Id.* at 1093. Because of this ambiguity, the court looked to the legislative history, public policy, and applicable case law to determine whether §303(i) precludes non-debtors from recovering. *Id.*

---

[18] It would be clearer if the phrase were "*its* right to judgment".

The legislative history of §303(i) indicates that only the debtor may recover damages resulting from an involuntary bankruptcy proceeding filed in bad faith. Specifically, the House and Senate reports provide, "[I]f a petitioning creditor filed the petition in bad faith, the court may award the debtor any damages proximately caused by the filing of the petition. These damages may include such items as loss of business during and after the pendency of the case, and so on." H.R. Rep. No. 95-595, at 324 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6280; S.Rep. No. 95-989, at 34 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5820 (identical text).

Second, as a matter of public policy, the court noted that allowing a non-debtor to recover damages could lead to "abuse" of the bankruptcy system. *Miles*, 430 F.3d at 1094. It stated:

> The introductory clause to § 303(i) provides that "the debtor" may waive the right to judgment, which would then enable the debtor to waive the third parties' damages. If such were the case, "debtors could extort payments from either the petitioning creditors or the non-debtors seeking damages, in exchange for either waiving or not waiving the damages claims." [*In re Mike Hammer Prods., Inc.*, 294 B.R. at 754.] The possible abuse of the involuntary bankruptcy process that could result makes it unlikely that Congress intended to permit third parties to seek damages under §303(i)(2), as it took great care to build into the Code provisions that would prevent abuse of the process.

*Id.* While the Court of Appeals left open "the question of whether non-petitioning creditors may seek damages under § 303(i)(2)", its analysis suggests the same result. *Id.* at 1094 n. 7.

That question was addressed in *In re VII Holdings Co.,* where two non-petitioning creditors requested attorneys' fees and costs pursuant to §§ 105(a) and 303(i), incurred because of the involuntary bankruptcy filed by another creditor. 362 B.R. at 664. The petitioning creditor in the case had a relationship with another party in interest with a history of using dilatory tactics, such as filing bankruptcies on the eve of foreclosure, to forestall the sale of the property at issue. *Id.* at 664-65. In opposition to the request for damages, the petitioning creditor argued that the non-petitioning

creditors lacked standing to recover damages under 303(i). *Id.* at 667. The court agreed, finding that §303(i)(1) clearly limited recovery to the debtor and that §303(i)(2) did not limit recovery to the debtor by its terms, but that the structure and scheme of §303(i) limited recover to the debtor. *Id.* at 664.

The three cases are well reasoned and the court is persuaded by the text, the legislative history, public policy and the reported cases that standing to assert a claim for damages under §303(i)(2) is limited to the debtor.

## **Conclusion**

The bank's motion will be granted as to Rule 9011 will be denied as to 11 U.S.C. §303(i)(2).

Alexandria, Virginia
December 10, 2010

> /s/ Robert G. Mayer
> Robert G. Mayer
> United States Bankruptcy Judge

Copy electronically to:

Kevin M. O'Donnell
John Paul Forest, II

16482